UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MIRIAM POE, an individual, <br><br> Plaintiff, <br><br> v. <br><br> WASTE CONNECTIONS US, INC., a Delaware Corporation formerly known as WASTE CONNECTIONS, INC.; and MURREY'S DISPOSAL COMPANY, INC., a Washington Corporation, <br><br> Defendants. | CASE NO. 17-6014 RJB <br><br> ORDER ON MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendants' Motion for Summary Judgment. Dkt. 42. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

This case arises from an employment dispute between the Plaintiff Miriam Poe and her former employer. Dkt. 1. The Plaintiff makes claims for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, *et. seq.*, the Family Medical Leave Act ("FMLA"), 42 U.S.C. 12101, *et. seq.*, the Washington Law Against Discrimination ("WLAD"), RCW 49.60,

ORDER ON MOTION FOR SUMMARY JUDGMENT - 1

*et. seq.*, the Washington Family Medical Leave Act ("WFMLA"), RCW 49.78, *et. seq.*, and for wrongful discharge in violation of public policy. Dkt. 15.

The Defendants now move for summary judgment. Dkt. 42. The Plaintiff opposes the motion for summary judgment, in part, and voluntarily dismisses her claims against Defendant Waste Connections US, Inc. and her claim for wrongful discharge. Dkt. 48. The Plaintiff's claims against Waste Connections US, Inc. and her claim for wrongful discharge should be dismissed with no further analysis. For the reasons provided below, the motion for summary judgment (Dkt. 42) should be granted, in part, and denied, in part.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

### A. FACTS

The Plaintiff began work for Defendant Murrey's Disposal Company, Inc. ("Murrey's") in 1989 and worked until1992. Dkt. 50, at 2. After a break, she returned to Murrey's in 2004, becoming an accounts' receivable clerk in 2006, this time staying until May 4, 2017. *Id.*

The Plaintiff has suffered severe depression and anxiety most of her adult life. Dkt. 50, at 1. Her symptoms worsened with the death of her husband in 2011, the death of both her brothers in 2015 and 2016, and with the death of her mother in 2017. Dkt. 50, at 2. The Plaintiff asserts that some of the main symptoms of her depression are negativity and unhappiness. *Id.*

The Plaintiff's direct manager, Rio Molina, who knew of the Plaintiff's depression, noticed the Plaintiff's negativity and unhappiness. Dkt. 49, at 73-74. Ms. Molina states that the Plaintiff was not pleasant to be around, reporting that the Plaintiff would repeatedly say, "I hate this place," about Murrey's. *Id.* In the fall before the events at issue here occurred, Ms. Molina began to keep notes on the Plaintiff, and only the Plaintiff. Dkt. 49, at 82. Ms. Molina explains that she was "looking for patterns of behavior" like "being difficult to work with," being

"combative," "not following direction," "not being a team player" all of which could "constitute a write-up at some point." Dkt. 49, at 82. Ms. Molina acknowledges that she intended to use this document at some point to attempt to terminate the Plaintiff's employment with Murrey's or at least be grounds for the Plaintiff to leave Ms. Molina's team. Dkt. 49, at 82-85. Another manager, Andrea Ditzler, who was not aware of the Plaintiff's depression, also felt that the Plaintiff was difficult to work with, noting the Plaintiff had a "negative attitude at work," was not "willing to be a part of a team and to contribute," "always giving an attitude." Dkt. 49, at 135. Ms. Ditzler noticed the Plaintiff would roll her eyes, slam papers around, give people a "nasty attitude if they asked her to do something," ignore people, intimidate others, and talk badly about her work, the company and her pay. Dkt. 49, at 140. Ms. Ditzler, Ms. Molina and the District Manager, Mark Gingrich, would meet regarding the difficulty people were having dealing with the Plaintiff and would try to come up with tactics to deal with her. Dkt. 49, at 141-142.

The Plaintiff attempted suicide in February of 2017. Dkt. 50, at 3. As a consequence, she went on medical leave from February 9, 2017 to May 4, 2017. Dkt. 43-1, at 12. While on leave, the Plaintiff received mental health treatment in the form of medication and therapy. Dkt. 50, at 3. Her goal was to "better [her] mental condition and prepare to return to work." Dkt. 50, at 3. The Plaintiff states that it was her "intention to return to full-time work at Murrey's as soon as [she] was able to do so." *Id*. During this time, the Plaintiff applied for, and received, surviving spouse benefits from the Social Security Administration. Dkt. 49, at 26. She did not apply for disability benefits for her mental health condition. *Id*. She did not want to work part-time permanently because she needed health insurance and other benefits. *Id.*, at 27.

All of the FMLA leave that she requested was approved. Dkt. 43-1, at 26. She communicated with Murrey's managers Mr. Gingrich and Ms. Ditzler about her medical leave

ORDER ON MOTION FOR SUMMARY JUDGMENT - 3

and return to work because Ms. Molina was on maternity leave. Dkt. 49, at 113 and 138-139.

According to Mr. Gingrich, he and the Plaintiff talked on the phone sometime before April 8, 2017. Dkt. 45, at 1. He asserts that she told him she may possibly resign because she was seeking Social Security benefits; she expressed concern that the Social Security benefits would not be sufficient income, however. *Id.*, at 2. Mr. Gingrich agreed to, and did, contact human resources for her by email regarding possible alternative sources of income and benefits. *Id.*

Also in early April, the Plaintiff and her health care providers began to consider her return to work, starting on a part-time basis. Dkt. 49, at 62, and 181-182. Her doctor, Geoffrey O. McNicoll, M.D., planned to return her to work full time, after seeing how well she tolerated part-time work. Dkt. 49, at 181-182. Her mental health counselor, Cheri Rohlman, states that the Plaintiff wanted to return first to work part time, then go full time, but the Plaintiff felt she was too old to work overtime. Dkt. 49, at 60. Plaintiff's response to the new mental health medication was also a factor in the timeframe for her return to full time work. Dkt. 49, at 34-35. On April 24, 2017, Dr. McNicoll signed a Fitness for Duty Certification form for the Plaintiff, indicating under the "restrictions" section that the Plaintiff could return to work on May 2, 2017 for "[two] days per week." Dkt. 49, at 174. While the form asked for the duration of any restrictions, none was provided on the form. *Id.* According to Dr. McNicoll, he assumed she would return to work full-time, but they would have had to assess that after she worked part-time for a while. Dkt. 49, at 163.

A few days after Dr. McNicoll signed her Fitness for Duty Certification form, the Plaintiff and Murrey's manager Mr. Gingrich met on April 27, 2017 to discuss her return to work. Dkt. 49, at 28 and 115. No one else was present for the meeting. *Id.* The Plaintiff asserts that she gave Mr. Gingrich her Fitness for Duty Certification and he asked her how long the two-day-per

ORDER ON MOTION FOR SUMMARY JUDGMENT - 4

week restriction would last. Dkt. 49, at 29. The Plaintiff states that she told him that she couldn't give him a specific date. *Id*. The Plaintiff maintains that at the April 27, 2017 meeting she told Mr. Gingrich that the "two-day-per week work restriction was temporary, and that the purpose of the restriction was to permit [her] to adjust to [her] medication." Dkts. 50, at 3 and 49, at 32-35. She denies ever telling Mr. Gingrich or anyone that her "two-day-per week work restriction was permanent." Dkt. 50, at 3. The Plaintiff states that she did not discuss the fact that her Social Security benefits would be reduced if she returned to work more than two days a week with anyone, including Mr. Gingrich. Dkt. 49, at 29.

Mr. Gingrich's view of the conversation is different – he asserts that based on their April 27 conversation, he felt that the Plaintiff did not want to come back to work full time - he alleges that they also discussed several income options and other resources (like COBRA for healthcare) should the Plaintiff choose not to return to work at all. Dkt. 49, at 114-115. He maintains that she told him that if she worked more than two days a week, she would have to pay back some of the Social Security benefits she received (or pay a penalty). Dkt. 45 at 2. He told her to come back on May 4, 2017, despite the fact that her doctor cleared her to begin working again on May 2, 2017. Dkt. 49, at 30.

That afternoon, Murrey's manager Ms. Ditzler exchanged the following text messages with Ms. Molina, who was out on maternity leave:

**Molina**: Brandi asked [the Plaintiff] if she was coming back and she said "no." Are we that lucky that she quit?

**Ditzler**: Mark is working it but supposed to be hush hush as if [sic] now

**Ditzler**: Word sure travels fast.

Dkt. 49, at 191-192.

In addition, that same day, on April 27, 2017, Mr. Gingrich emailed the Plaintiff which

ORDER ON MOTION FOR SUMMARY JUDGMENT - 5

included a paragraph of options for "other" income for her including: accessing her 401K early, apply for Social Security Disability Insurance, or applying for Non-Grant Medical Insurance, etc. Dkt. 49, at 199. Mr. Gingrich acknowledges that he cut and pasted the paragraph from an email the human resources department sent him two weeks before the April 27, 2017 meeting. Dkt. 49, at 114 and 186.

On May 2, 2017, around 6:30 p.m., Ms. Molina again exchanged text messages with Ms. Ditzler.

> **Molina**: [The Plaintiff] is calling me. Is she still an employee[?] If she is, I feel like I should call her back. If she isn't, I really don't want to talk to [her] ever again. I don't have the patience.
>
> **Ditzler**: I don't think I would call her back . . . Mark is meeting with her Thursday and trying to get her to resign . . . I would say at this point let him handle it . . . you are in leave you do not owe her a call!
>
> **Ditzler**: Maybe she just wants to meet you for lunch and catch up. LOL
>
> **Molina**: I felt bad not answering so I called back. She is going to sign exit ppw on Thursday. She said doctor said she could only work part time and we told her the position is full time only so she will resign.

Dkt. 49, at 193-196. Ms. Ditzler acknowledges that she did not want the Plaintiff to return to work because of her negativity. Dkt. 49, at 143-144. Mr. Gingrich acknowledged that it was possible he told Ms. Ditzler that he was going to try to get the Plaintiff to resign. Dkt. 49, at 117. He acquired information regarding her vacation and sick leave balances and prepared separation paperwork for the Plaintiff to sign at the May 4, 2017 meeting. Dkt. 49, at 123-125.

At the May 4, 2017 meeting (which was only attended by the Plaintiff and Mr. Gingrich), the Plaintiff asserts that:

> [Mr. Gingrich] again asked her how long those two days were going to last, and [she] told him, [she] didn't know, [she] [couldn't] tell [him] specifically when [she could] come back to work full time. And he mentioned something about [her] job being full time, and [she] told him, [She understood] that, but right now

> [she couldn't] work full time. And so he said to [her] that since [she] couldn't give him a definite time that [she] had to resign.

Dkt. 49, at 31. The Plaintiff concedes that Mr. Gingrich agreed to accommodate a two-day-per week restriction on a temporary basis, "but at the same time, he was pushing [her] to tell him a date" she could go back to full time employment and she "couldn't give him a specific time" because she needed to see how she would adjust to her mental health medication over the next few months. Dkt. 49, at 32 and 34-35. She states that she felt she had no choice but to resign - that he told her "that if [she] couldn't come back full time that they could not keep [her] part time for two days, so the next step was letting [her] go." Dkt. 49, at 37. The Plaintiff states that Mr. Gingrich pressured her to sign the resignation paperwork. Dkt. 49, at 37. As to that pressure, the Plaintiff does acknowledge that Mr. Gingrich didn't threaten her and she wasn't afraid he would fire her. Dkt. 43-1, at 23. The Plaintiff signed the separation paperwork at the end of the meeting on May 4, 2017.

The Plaintiff states that her depression worsened after the above events and she lost her insurance. Dkt. 49, at 42-45. She was not able to afford treatment in the form of her medication or therapy. Dkt. 49, at 43. The Plaintiff contends that she was so effected she was unable to work or even look for work. Dkt. 49, at 14-15.

In June of 2018, the Plaintiff was able to obtain health insurance, restarted her antidepressant medication, and began working part time. Dkt. 49, at 19-20. She states that, although she is over 65 years old, she would rather work full time if she could find a position. Dkt. 49, at 21.

**B. ORGANIZATION OF OPINION**

This opinion will first provide the summary judgment standard, and then address the motion for summary judgment on the Plaintiff's disability discrimination claims under the ADA and WLAD jointly, and lastly, the Plaintiff's FMLA and WFMLA claims jointly.

ORDER ON MOTION FOR SUMMARY JUDGMENT - 7

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. DISABILITY DISCRIMINATION CLAIMS UNDER THE ADA AND WLAD

The ADA, and the Washington corollary, the WLAD, prohibits an employer from discriminating against an employee based on a disability. 42 U.S.C. § 12112 (a); RCW 60.180 (3). To prevail on her discrimination claims under both the ADA and WLAD, the Plaintiff is required to establish: (1) that she was disabled under the ADA and WLAD; "(2) that she was a qualified individual with a disability; and (3) that she was discriminated against by her employer because of that disability." *Dunlap v. Liberty Nat. Products, Inc.*, 878 F.3d 794, 798–99 (9th Cir. 2017)(ADA); and *See Mikkelsen v. Public Utility District No. 1 of Kittitas County,* 189 Wash.2d 516, 526-527 (2017)(WLAD).

Although the WLAD offers protections "at least as broad" as those offered under the ADA, Washington courts look to federal case law interpreting remedial statutes like the ADA and Title VII "to guide interpretation of the WLAD." *Taylor v. Burlington N. R.R. Holdings Inc.*, 904 F.3d 846, 848–49 (9th Cir. 2018)(*quoting Kumar v. Gate Gourmet Inc.*, 180 Wash.2d 481, 325 P.3d 193, 197–98 (2014)(*internal quotation marks and footnotes omitted*). "Where [the Washington Supreme Court] has departed from federal antidiscrimination statute precedent, however, it has almost always ruled that the WLAD provides greater employee protections than its federal counterparts do." *Id.* Accordingly, the Plaintiff's disability claims under both the ADA and WLAD will be analyzed together using federal law unless the WLAD differs, which will be specifically noted. This opinion will now turn to whether the three prong disability discrimination test is met. Because the Plaintiff asserts two forms of "because of disability"

discrimination, (failure to accommodate and disparate treatment) discussion of the third prong has two subparts.

### 1. Prong One - Disabled Under the ADA and WLAD

Murrey's does not contest that the Plaintiff's major depressive order constitutes a disability for purposes of both the ADA and the WLAD. *See Snead v. Metropolitan Property & Cas. Ins. Co.,* 237 F.3d 1080 (9th Cir. 2001)(depression can be considered a mental impartment under the ADA if it results from a documented physiological or mental disorder) and *See Riehl v. Foodmaker, Inc.,* 152 Wash.2d 138 (2004)(*en banc*)(employer violated WLAD when it terminated and refused to rehire employee with depression). The Plaintiff meets this prong.

### 2. Prong Two – "Qualified Individual with a Disability"

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Equal Employment Opportunity Commission ("EEOC") regulations further provide that: a "qualified individual with a disability" "satisfies the requisite skills, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2 (m).

There are issues of fact as to whether the Plaintiff was a "qualified individual with a disability" here. The Defendant does not attack the Plaintiff's skills, experience, or education. Instead, it argues that the Plaintiff doesn't meet this second prong - she was not a "qualified individual" - because she could not work full time. It asserts that her request for part time employment did not have an end date, and so was indefinite. It maintains that full time performance was an essential function of her job. The Plaintiff asserts that she told Murrey's

that the accommodation was for a month or two while she determined if her medication was properly adjusted. She argues that she intended to go back to work full time. Mr. Gingrich maintains that she did not tell him that the accommodation was limited or that she wanted full time work. The Defendant also attacks the validity of the Plaintiff's assertions as to this issue by pointing to other people's testimony and records. Yet, the Plaintiff and Mr. Gingrich were the only people in any of the meetings. There are issues of fact as to this prong.

3. Prong Three, Subpart A - "Because of Disability" Discrimination Claim - Failure to Accommodate

Plaintiff's claims for failure to accommodate are actionable claims of discrimination under both the ADA, *Dunlap,* at 794, and the WLAD, *Davis v. Microsoft Corporation,* 149 Wash.2d 521 (2003). "The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a qualified individual, the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) *cert. denied sub nom. Snapp v. Burlington N. Santa Fe Ry. Co.*, 18-567, 2019 WL 113164 (U.S. Jan. 7, 2019)(*citing 42* U.S.C. § 12112(b)(5)(A)). "[N]otifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Snapp,* at 1095. "[I]f an employer receives notice and fails to engage in the interactive process in good faith, the employer will face liability if a reasonable accommodation would have been possible." *Id.* "[D]iscrimination results from denying an available and reasonable accommodation." *Id.*

The Defendant's motion for summary judgment dismissal of Plaintiff's ADA and WLAD failure to accommodate claims (Dkt. 42) should be denied. As above, there are issues of fact as to whether the Plaintiff was a "qualified individual." Parties do not dispute that Murrey's received adequate notice of the requested accommodation. There is no meaningful dispute that, if Plaintiff's version of events is believed, that the requested accommodation was available. While Murrey's asserts that the Plaintiff's resignation was a functional withdrawal from the interactive process, there are issues of fact as to whether the Plaintiff was pressured into that resignation by Murrey's. The Plaintiff concedes that Mr. Gingrich agreed to accommodate a two-day-per week restriction on a temporary basis, "but at the same time, he was pushing [her] to tell him a date" she could go back to full time employment and she "couldn't give him a specific time" because she needed to see how she would adjust to her mental health medication over the next few months. Dkt. 49, at 32 and 34-35. She states that she felt she had no choice but to resign - that he told her "that if [she] couldn't come back full time that they could not keep [her] part time for two days, so the next step was letting [her] go." Dkt. 49, at 37. If Plaintiff's version of events is believed, the nature of the interactive process was a coercive attempt to get rid of the Plaintiff. There are issues of fact as to whether Murrey's participated in the interactive process in good faith. "[A]n employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." *Snapp*, at 1095 (*quoting Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1116 (9th Cir. 2000).

"[I]f an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Snapp,* at 1095. Murrey's does not carry its' burden here. There is no showing that a "reasonable accommodation" was not available. While it repeatedly argues that it

offered an accommodation - to let her return to work on a two day a week schedule, if her version of events is credited, it was an illusionary promise because she faced pressure not to use the accommodation and just resign. *See Stewart v. Snohomish County Public Utility District No. 1*, 2018 WL 5621128 (9th Cir. October 30, 2018)(accommodation is not reasonable where employee faced pressure from employer not to use the accommodation).

The Defendant's motion for summary judgment dismissal of the Plaintiff's ADA and WLAD disability discrimination claims based on a failure to accommodate should be denied.

4. <u>Prong Three, Subpart B - "Because of Disability" Discrimination Claim - Disparate Treatment</u>

Plaintiff's claims for disparate treatment are actionable claims of discrimination under both the ADA, *Dunlap,* at 794, and the WLAD, *Mikkelsen,* at 526-527. In making a claim for disparate treatment under either the ADA or WLAD, Plaintiffs may point to direct evidence or inferential evidence of discrimination. *Snead v. Metropolitan Property & Cas. Inc. Co.,* 237 F.3d 1080, 1093 (9th Cir. 2001); *Mikkelsen*, at 526-527. The burden-shifting scheme announced in *McDonnell Dougals Corp. v. Green,* 411 U.S. 792 (1973) applies to both claims under the ADA and under WLAD. *Id.*

Under the *McDonnell* framework, "an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). "The burden then shifts to the employer to provide a legitimate, nondiscriminatory . . . reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Id.*

The plaintiff must make a *prima facia* case by showing that (1) they belong to a protected class, (2) they were qualified for the position (they were performing their job in a satisfactory

ORDER ON MOTION FOR SUMMARY JUDGMENT - 13

1  manner), (3) they were subjected to an adverse employment action, and (4) they were replaced

2  by or were treated less favorably than a person outside the protected class. *McDonnell Douglas*

3  at 802. It is important to remember that the requisite degree of proof necessary to establish a

4  *prima facie* case for an ADA claim "on summary judgment is minimal and does not even need to

5  rise to the level of a preponderance of the evidence." *See Aragon v. Republic Silver State*

6  *Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir. 2002).

7        The parties do not contest the first or fourth prong of the *prima facia* case: that the

8  Plaintiff belongs to a protected class (she is a person with a disability) and that she was "replaced

9  by or treated less favorably than a person outside the protected class." The dispute on the *prima*

10 *facia* case centers around the second and third prongs.

11       The Plaintiff has carried her burden on the *McDonnell Douglas prima facia* case. The

12 Plaintiff has sufficiently demonstrated that she was qualified for the position in regard to her

13 education, skills and experience. As above, there are at least issues of fact as to whether she

14 could eventually work full time. The Plaintiff has carried her burden as to the second prong. As

15 to the third prong of the *prima facia* case, the Plaintiff has pointed to sufficient facts, if believed,

16 that demonstrate that she suffered an adverse employment action, that is that she did not

17 voluntarily resign, but was fired. The Plaintiff has carried her burden on the *McDonnell Douglas*

18 *prima facia* case.

19       The burden then shifts to Murrey's to "articulate a legitimate, nondiscriminatory reason

20 for the adverse employment action." *McDonnell Douglas,* at 802. Murrey's meets its burden

21 here – it points to evidence supporting the Plaintiff's voluntary resignation. Mr. Gingrich states

22 that the Plaintiff told him that she was leaving and that he was helping her by finding other

23

24

ORDER ON MOTION FOR SUMMARY JUDGMENT - 14

possible sources of income and benefits. Murrey's also notes that other employees were discussing the Plaintiff's decision not to return.

Where an employer meets its burden, the burden shifts back to the plaintiff to show that the employer's nondiscriminatory reason for the adverse employment action was a pretext for discrimination. *McDonnell Douglas,* at 802. In the Ninth Circuit, a plaintiff who alleges a disparate treatment claim under the ADA is allowed "to prove her case by demonstrating either that a discriminatory animus is the sole reason for the challenged action or that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate." *Mendoza v. The Roman Catholic Archbishop of Los Angeles*, 824 F.3d 1148, 1150 (9th Cir. 2016). Under the WLAD, a plaintiff must prove their disability was at least a "substantial factor" in the adverse employment action at this phase in the *McDonnell Douglas* burden shifting scheme. *Mikkelsen*, at 527 (*internal citations omitted*). The WLAD's "substantial factor" test provides that "although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener v. Clark College,* 181 Wash.2d 439, 447 (2014).

The Plaintiff argues that Murrey's explanation – that she voluntarily resigned is a pretext for forcing her to quit based on the symptoms of her depression. Under both the ADA and WLAD, "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination." *Gambini v. Total Renal Care, Inc.,* 468 F.3d 1087, 1093 (9th Cir. 2007)(holding that "where an employee demonstrates a causal link between the disability produced conduct and the termination, the jury must be instructed that it may find that the employee was terminated on the impermissible basis of her disability"). There are issues of fact as to whether she voluntarily resigned. The Plaintiff asserts that Mr. Gingrich forced her into

resigning because he was aware that two other managers, Ms. Molina and Ms. Ditzler, were dissatisfied with the Plaintiff due to a symptoms of her depression – her negativity and unhappiness. She points to their testimony and the text messages sent between Ms. Molina and Ms. Ditzler around the dates of the meetings the Plaintiff had with Mr. Gingrich. The Plaintiff has pointed to genuine issues of fact as to whether Mr. Gingrich forced her to resign because of the symptoms of her disability. The Plaintiff has pointed to sufficient evidence, if believed, that discriminatory animus was the sole reason for the termination of her employment for purposes of the ADA, and for purposes of the WLAD, that discrimination was a "substantial factor" in her termination. She carried her burden on this portion of the *McDonnell Douglas* burden shifting scheme.

The Defendant's motion for summary judgment dismissal of the Plaintiff's ADA and WLAD disability discrimination claims based on disparate treatment should be denied.

### C. INTERFERENCE WITH REINSTATEMENT RIGHTS CLAIMS UNDER THE FMLA AND WFMLA

"Under the FMLA employees who must be absent from work because of their own illness, to care for family members who are ill, or to care for new babies are provided job security." *Gambini,* at 1096(*internal quotation marks and citations omitted*). The WFMLA "mirrors its federal counterpart and provides that courts are to construe its provisions in a manner consistent with similar provisions of the FMLA." *See Crawford v. J.P. Morgan Chase NA,* 983 F. Supp. 2d 1264, 1269 (W.D. Wash. 2013). FMLA covered employees, like the Plaintiff here, are entitled to up to twelve weeks of leave each year and guarantees reinstatement after exercising leave rights. *Gambini,* at 1097. The FMLA "creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected

leave." *Id.* "In order to prevail on an FMLA claim, a plaintiff need only prove by a preponderance of the evidence that [their] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [them]." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001). They "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. . . No scheme shifting the burden of production back and forth [like the *McDonnell Douglas* framework] is required." *Id.*

The Defendant's motion for summary judgment on the Plaintiffs' FLMA and WFMLA claims should be denied. Murrey's argues that the Plaintiff voluntarily quit and so suffered no adverse employment action. As above, the Plaintiff points to sufficient evidence in dispute as to whether she was coerced into leave Murrey's. Murrey's also asserts that the Plaintiff was offered a return to work on the two-day-a week basis that she requested. The Plaintiff points to evidence that that was an illusionary offer. There are issues of fact as to the Plaintiff's FLMA and WFMLA claims and they should not be dismissed at this time.

### III.  ORDER

Therefore, it is hereby **ORDERED** that:

- Defendants' Motion for Summary Judgment (Dkt. 42) **IS**:
  - **GRANTED** as to Plaintiff's claims against Waste Connections US, Inc., and her claim for wrongful discharge in violation of public policy,
    - Plaintiff's claims against Waste Connections US, Inc. and her claim for wrongful discharge in violation of public policy **ARE DISMISSED**; and
  - **DENIED** as to the Plaintiff's claims under the ADA, FMLA, WLAD, and WFMLA.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 7th day of March, 2019.

_____
ROBERT J. BRYAN
United States District Judge